J-S18010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BILLY RAY GORDON | |
| Appellant | No. 897 WDA 2017 |

Appeal from the Judgment of Sentence Entered May 25, 2017
In the Court of Common Pleas of Erie County
Criminal Division at No.: CP-25-CR-0003070-2016

BEFORE: STABILE, MUSMANNO, JJ., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 12, 2018**

Appellant Billy Ray Gordon appeals from the May 25, 2017 judgment of sentence entered in the Court of Common Pleas of Erie County ("trial court"), following his jury convictions for first-degree murder, aggravated assault, recklessly endangering another person ("REAP"), possession of instruments of crime ("PIC"), abuse of a corpse, and tampering with or fabricating physical evidence.[1] Upon review, we affirm.

The facts and procedural history of this case are undisputed, and thoroughly recounted in the trial court's opinion. **See** Trial Court Opinion, 8/8/17, 1-13. Briefly, in connection with the stabbing death of his wife, Linda

_____

[1] 18 Pa.C.S.A. §§ 2501(a), 2702(a)(1), 2705, 907(a), 5510, and 4910(1), respectively.

Gordon, Appellant was found guilty by a jury of the above-mentioned crimes. On May 25, 2017, the trial court sentenced Appellant to life imprisonment without the possibility of parole.[2] Appellant did not file any post-sentence motions. Appellant timely appealed to this Court. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, asserting, *inter alia*:

> [I.] That the evidence produced at trial by the Commonwealth of Pennsylvania was insufficient to support convictions in this matter with first degree murder (Murder 1), aggravated assault, [REAP], [PIC], abuse of corpse and tampering with or fabricating physical evidence[.]

Rule 1925(b) Statement, 7/7/17 (unnecessary capitalizations omitted) (sic).

In response, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant repeats the same sufficiency-of-the-evidence issue for our review.

"A claim challenging the sufficiency of the evidence is a question of law."

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and

---

[2] The trial court merged the sentences for aggravated assault and REAP with the life imprisonment sentence for first-degree murder and imposed separate consecutive sentences for PIC (one to four years in prison), abuse of corpse (one to two years in prison) and tampering with or fabricating physical evidence (six to twenty-four months' imprisonment).

inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Before we may address the merits of Appellant's sufficiency claim, we must determine whether he has preserved it for our review. It is settled that to preserve a challenge to the sufficiency of the evidence on appeal, the appellant's Rule 1925(b) statement must state with specificity the element or elements of the crime upon which the appellant alleges the evidence was insufficient. *See Commonwealth v. Garland*, 63 A.3d 339, 334 (Pa. Super. 2013). "Such specificity is of particular importance in cases, where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Garland*, 63 A.3d at 344 (citations omitted). In *Garland*, the appellant's Rule 1925(b) statement simply stated, "[t]he evidence was legally insufficient to support the convictions." *Id.* The panel found the claim waived, noting, among other things, that the appellant "failed to specify which elements he was challenging in his Rule 1925(b) statement." *Id.* Moreover, given this Court's desire to apply Rule 1925 in a "predictable, uniform fashion," we have determined that waiver applies even where, as here, the Commonwealth fails to object and the trial court addresses the issue in its

- 3 -

Rule 1925(a) opinion. ***Commonwealth v. Roche***, 153 A.3d 1063, 1071-72 (Pa. Super. 2017), ***appeal denied***, 169 A.3d 599 (Pa. 2017); ***see Commonwealth v. Tyack***, 128 A.3d 254, 260 (Pa. Super. 2015) (holding that Tyack's "boilerplate" concise statement declaring "that the evidence was insufficient to support his conviction" was too vague even where Tyack was convicted only of one crime).

Instantly, Appellant's Rule 1925(b) statement, as detailed above, lacks specificity. In particular, Appellant fails to set forth in his Rule 1925(b) statement the elements of each of the six crimes that the Commonwealth allegedly did not prove beyond a reasonable doubt following a four-day jury trial. Accordingly, we conclude that Appellant has waived his sufficiency-of-the-evidence claim for lack of specificity. Indeed, as noted, we have held appellants waived such claims for lack of specificity under less egregious circumstances.

Even if Appellant's sufficiency claim was preserved, he still would not be entitled to relief. After careful review of the record and relevant case law, we conclude that the trial court accurately and thoroughly addressed the merits of Appellant's claim. ***See*** Trial Court Opinion, 8/8/17, at 13-20. Accordingly, we affirm Appellant's judgment of sentence. We further direct that a copy of the trial court's August 9, 2017 opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/12/2018

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF ERIE COUNTY, PENNSYLVANIA
v. : CRIMINAL DIVISION
:
BILLY RAY GORDON, : NO. CR 3070 of 2016
      Defendant :

Appearances:     Emily M. Merski, Esq., on behalf of Billy Ray Gordon (Appellant)

               Erin C. Connelly, Assistant District Attorney, and D. Robert Marion, Jr.,
                  Assistant District Attorney, on behalf of the Commonwealth
                  (Appellee)

**OPINION**

Domitrovich, J., August 8th, 2017

The instant matter is currently before the Pennsylvania Superior Court on the appeal of the Billy Ray Gordon (hereafter referred to as "Appellant"). Following a Criminal Jury Trial, which began on March 27th, 2017 through March 30th, 2017, the jury found Appellant guilty of Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person, Possession of Instruments of Crime and Tampering with or Fabricating Physical Evidence. On appeal, Appellant raises two issues: [1] whether the Commonwealth presented sufficient evidence to support the jury's conviction of Appellant for Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person, Possession of Instruments of Crime and Tampering with or Fabricating Physical Evidence, and [2] whether Appellant's counsel, Mark T. Del Duca, Esq., represented Appellant effectively during the Criminal Jury Trial.

**Factual History**

On July 21st, 2016, around 5:00 p.m., a witness, Mark Dodick, observed Appellant arriving at the residence of Terrance Porter on West 25th Street. *See Notes of Testimony, Jury Trial, Day 2, March 28th, 2017, pg. 327, lines 9-24.* Mr. Dodick observed Appellant wearing a white t-shirt with block lettering and white pants. *See id, pg. 330, lines 11-21.* Appellant and his wife, Linda Gordon, arrived at Mr. Porter's residence in their silver Cadillac vehicle to purchase heroin. *See*

1

*Notes of Testimony, Jury Trial, Day 3, March 29th, 2017, pg. 716, line 18 – pg. 717, line 6*. Later that evening, Mr. Porter saw Appellant and his wife, Linda Gordon, at the block party near the Plymouth Tavern, located on 10th Street and State Street. *See N.T., Jury Trial, Day 2, pg. 353, line 15 – pg. 354, line 1; pg. 355, lines 8-10*. Mr. Porter observed Appellant wearing a white t-shirt with block lettering, white pants and black & white sneakers. *See id, pg. 354, lines 13-19*. Surveillance video footage from the Plymouth Tavern shows Appellant entering the bar at 9:13 p.m. and exiting the bar at 9:16 p.m., wearing a baseball cap, light & dark colored shoes, white jeans/pants and a white t-shirt with block lettering stating "Straight Outta Erie." *See N.T., Jury Trial, Day 3, pg. 633, line 21 – pg. 636, line 15*. Mr. Porter called Appellant around 11:30 p.m. that evening for a ride, but Appellant stated he was "busy picking up his grandchildren." *See N.T., Jury Trial, Day 2, pg. 356, lines 3-20*.

On July 22nd, 2016, at 8:42 a.m., Sergeant Kevin Fries, City of Erie Police Department, was dispatched to 1525 East 19th Street, Erie, Pennsylvania for a report of a deceased person. *See id, pg. 220, line 24 – pg. 221, line 19*. The dispatch was in response to a 911 caller, Susan Carr, who observed a deceased white female lying on the grassy area near a wooden fence on the south side of East 19th Street. *See id, pg. 222, lines 11-17*. Upon arriving on scene, Sergeant Fries noticed the deceased female, wearing a purple shirt and jeans, lying on the grassy area on the south side of East 19th Street. *See id, pg. 225, lines 14-24*. Sergeant Fries observed the deceased white female had several stab wounds on her back and immediately called for EmergyCare. *See id, pg. 226, lines 2-4*. Detective-Sergeant Christopher Janus and Detective Mike Hertel, City of Erie Police Department, assigned as primary investigators, arrived at 8:50 a.m. to secure the crime scene and began looking for evidence. *See N.T., Jury Trial, Day 3, pg. 620, line 20 – pg. 621, line 7*. Detective-Sergeant Janus was able to identify the deceased female as Linda Gordon through photographs provided and a tattoo on Linda Gordon's person. *See id, pg. 622, lines 7-9*.

2

Earlier that morning, around 8:05 a.m., Corporal James Langdon, City of Erie Police Department, and his partner, Patrolman Barber, were dispatched to Appellant's residence at 1268 East 21st Street, Erie, Pennsylvania, for an alleged burglary in progress. *See N.T., Jury Trial, Day 2, pg. 236, lines 5-13.* Upon arriving, Corporal Langdon and Patrolman Barber made contact with Appellant, who stated "Someone's in my house," "I see shadows" and "He's behind the couch." *See id, pg. 237, lines 19-21.* After securing the residence, Corporal Langdon and Patrolman Barber did not find anyone inside the residence. *See id, pg. 239, lines 4-22.* At 8:32 a.m., as Corporal Langdon and Patrolman Barber were leaving, Appellant stated "I don't know where my wife's at." *See id, pg. 241, lines 1-3.* Appellant stated he and his wife were at the Plymouth the night before and had gotten into an argument before coming home. *See id, pg. 242, lines 22-23.* Corporal Langdon observed Appellant was not agitated, but was "on edge," i.e. looking around, questioning everything and appearing upset. *See id, pg. 251, line 1-9.* Corporal Langdon and Patrolman Barber left Appellant's residence at 8:32 a.m., returned to the City of Erie Police Department and spoke with Sergeant Fries; however, after hearing the dispatch for a deceased person and at the advisement of Sergeant Fries, Corporal Langdon and Patrolman Barber returned to Appellant's residence, where they found Appellant was not at home. *See id, pg. 243, line 19 – pg. 246, line 6.* When Appellant returned home ten (10) minutes later in his silver Cadillac vehicle, Corporal Langdon requested Appellant accompany them to the City of Erie police station to file a missing person report and for further questioning. *See id, pg. 246, line 24 – pg. 247, line 2.* Appellant voluntarily complied and accompanied the police officers to the City of Erie Police Department. *See id, pg. 247, lines 2-4.*

Detective-Sergeant Janus and Detective Hertel returned to the City of Erie police station to interview Appellant. *See N.T., Jury Trial, Day 3, pg. 623, lines 14-16.* In the interview room, Appellant received a telephone call on his cell phone from an unknown individual; afterwards,

3

Appellant learned a deceased female had been discovered and asked Detective-Sergeant Janus and Detective Hertel if his wife had been found. *See id, pg. 624, line 4 – pg. 626, line 7.* When the police officers stated they could not identify the deceased female as his wife, Appellant began a "temper tantrum," i.e. pounding on the table, punching the wall, lying on the floor on his stomach, kicking his feet and pounding the floor. *See id, pg. 626, lines 7-13.* Appellant was then booked and placed into a jail cell, during which the items on Appellant's person were seized, including his gold ring with suspected blood on it. *See id, pg. 626, line 19 – pg. 627, line 16.* While being led to a jail cell, Appellant asked Detective-Sergeant Janus and Detective Hertel "how many times was she shot," to which Detective-Sergeant Janus and Detective Hertel did not respond. *See id, pg. 629, lines 11-18.* After Appellant was booked, Detective-Sergeant Janus checked the local news outlets to find whether the news was reporting on how the female became deceased. *See id, pg. 630, lines 1-4.* The media, at that time, never reported on how the person became deceased. *See id, pg. 630, lines 7-10.*

Thereafter, Detective-Sergeant Janus and Detective Hertel secured and executed search warrants of Appellant's residence and vehicle. *See id, pg. 630, lines 18-24.* Detective Jody Rager, City of Erie Police Department, photographed the exterior of the residence and searched for physical evidence of homicide, but found no physical evidence inside the residence. *See N.T., Jury Trial, Day 2, pg. 458, line 7 – pg. 459, line 9.* Detective Rager searched Appellant's vehicle and then had the vehicle towed to the basement of the City of Erie police station for processing. *See id, pg. 460, line 1- pg. 461, line 20.* Detective Rager observed blood transfer, i.e. blood smears, in several areas of Appellant's silver Cadillac vehicle, specifically on the door near the steering wheel, which Detective Rager then swabbed and sent to the Pennsylvania State Police crime lab. *See id, pg. 463, line 6 – pg. 473, line 12.* Detective Rager also swabbed Appellant's ring and sent the swab to the Pennsylvania State Police crime lab. *See id, pg. 474, line 15 – pg. 476, line 7.*

4

On July 23rd, 2016, Detective-Sergeant Janus and Detective Hertel returned to the crime scene and tried to obtain surveillance video footage from areas nearby. *See N.T., Jury Trial, Day 3, pg. 632, lines 12-15.* Detective-Sergeant Janus discovered a knife in the dense wooded area on the north side of East 19th Street, around twenty feet (20') from the crime scene, and the knife was collected by Detective-Sergeant Kenneth Kensill, City of Erie Police Department. *See N.T., Jury Trial, Day 2, pg. 260, line 12 – pg. 261, line 1.* At the City of Erie police station, Detective-Sergeant Kensill photographed the knife, which was between eight inches (8") and eight and one-half inches (8 ½") in length. *See id, pg. 264, line 15 – pg. 265, line 6.* Detective-Sergeant Kensill observed a red substance on an area of the knife; thereafter, he photographed the area, tested the substance, which showed presumptively for blood, and collected a blood sample, which was sent to the Pennsylvania State Police crime lab. *See id, pg. 265, line 19 – pg. 266, line 3.*

Dr. Eric Vey, M.D., forensic pathologist, conducted the autopsy of Linda Gordon on July 22nd, 2016 at 2:30 p.m. *See id, pg. 281, lines 9-14.* Dr. Vey confirmed twenty (20) sharp force injury wounds, i.e. knife wounds, on Linda Gordon's body, including thirteen (13) sharp force injury wounds on the front and back of Linda Gordon's torso and seven (7) sharp force injury wounds in Linda Gordon's upper left extremity, i.e. left forearm, left arm and left shoulder. *See id, pg. 285, lines 1-25.* Dr. Vey also observed several contusions and abrasions on Linda Gordon's body, which Dr. Vey concluded were made contemporaneously with the sharp force injury wounds. *See id, pg. 304, line – pg. 306, line 7.* Dr. Vey also sent Linda Gordon's blood to National Medical Services ("NMS") labs for toxicology analysis, which returned positive for several substances, including cotinine, nicotine, caffeine, Levamisole, methylecgonine, Flexeril, cocaine, benzoylecgonine, morphine, 6-monoacetylmorphine, Prozac, fluoxetine, diphenhydramine, diltiazem and hydroxyzine; however, Dr. Vey concluded none of these substances killed Linda Gordon and "but for the stab wounds, she [Linda Gordon] would still be alive today." *See id, pg.*

5

*306, line 23 – pg. 311, line 10.* Ultimately, Dr. Vey concluded Linda Gordon died as a result of multiple stab wounds to her torso and no other intervening forces could have caused Linda Gordon's death. *See id, pg. 306, line 18-22.* Based upon the onset of rigor mortis and non-fixed livor mortis, Dr. Vey estimated Linda Gordon was deceased for less than eighteen (18) hours. *See id, pg. 313, lines 1-9.*

On July 27th, 2016, Bradley McLaughlin, Pennsylvania State Police forensic scientist, examined the blood swabs received from Detective Rager and prepared his formal Report. *See N.T., Jury Trial, Day 3, pg. 506, line 6 – pg. 508, line 22.* During his analysis, Mr. McLaughlin positively identified blood on Appellant's ring and on three (3) swabs from Appellant's silver Cadillac vehicle, which were then prepared and sent to the Pennsylvania State Police crime lab for DNA analysis, along with a dried sample of whole blood and fingernail clippings from Linda Gordon. *See id, pg. 508, line 25 – pg. 524, line 13.*

Jillian Crouch, Pennsylvania State Police forensic DNA scientist, processed the items received from Bradley McLaughlin for potential DNA and authored two (2) Reports – a Report dated October 30th, 2016 and a Report dated December 23rd, 2016.[1] *See id, pg. 536, line 8 – pg. 537, line 5.* A test of the swab of Appellant's ring indicated a mix of two (2) individuals, and Appellant and Linda Gordon could not be excluded as potential contributors to the mix. *See id, pg. 539, line 11 – pg. 544, line 9.* A test of the swab of the knife handle for DNA indicated thirteen (13) of the twenty-four (24) DNA areas tested, which matched the known reference for Linda Gordon. *See id, pg. 544, line 13 – pg. 546, line 4.* A test of the swab of the knife blade indicated all twenty-four (24) DNA areas, which matched the known reference for Linda Gordon. *See id, pg. 546 line 5 – pg. 547, line 10.* A test of swab #2 from the Cadillac indicated a mix of two (2)

---

[1] The October 30th, 2016 Report was prepared using only the items from Bradley McLaughlin and the known DNA reference, i.e. blood and fingernail clippings, for Linda Gordon. Thereafter, after requesting and receiving a buccal swab from Appellant Billy Ray Gordon, the December 23rd, 2016 Report was prepared. *See N.T., Jury Trial, Day 3, lines 15-25.*

6

individuals, and Appellant and Linda Gordon could not be excluded as potential contributors to the mix. *See id, pg. 547, line 12 – pg. 548, line 16*. A test of swab #5 from the Cadillac indicated a mix of two (2) individuals, and Appellant and Linda Gordon could not be excluded as potential contributors to the mix. *See id, pg. 548, line 17 – pg. 549, line 14*. Jillian Crouch also processed the right fingernail clippings of Linda Gordon, containing a reddish-brown substance, for DNA; specifically, a Y-specific test, indicating a partial Y chromosome, i.e. ten (10) out of sixteen (16) areas tested, which matched a known sample of Appellant, meaning neither Appellant nor any of Appellant's paternally-related male relatives could be excluded. *See id, pg. 549, line 16 – pg. 553, line 10*.

At the Criminal Jury Trial, the Commonwealth called Mark Dodick. Mr. Dodick indicated he observed Appellant arriving at Terrance Porter's residence on West 25th Street on July 22nd, 2016 around 6:00-6:45 a.m. in a silver Cadillac vehicle. *See N.T., Jury Trial, Day 2, pg. 329, line 6 – pg. 330, line 5; pg. 331, line 15018*. According to Mr. Dodick, Appellant was in his boxers carrying white clothes. *See id, pg. 330, line 22 – pg. 331, line 3*.

The Commonwealth also called Terrance Porter as a witness. Mr. Porter was familiar with Appellant, who he referred to as "Unc" or "Uncle." *See id, pg. 349 line 19 – pg. 351, line 14*. According to Mr. Porter, after he woke up around 5:45 a.m. on July 22nd, 2016, Appellant arrived at Mr. Porter's residence in his silver Cadillac vehicle playing loud music. *See id, pg. 358, line 10 – pg. 360, line 3*. Appellant entered the residence, where Mr. Porter observed Appellant "drenched in blood," and when Mr. Porter asked Appellant what happened, Appellant stated he murdered Linda. *See id, pg. 360, lines 5-17*. Appellant asked for a change of clothes, which Mr. Porter provided. *pg. 361, lines 9-18*. Mr. Porter indicated Appellant "gave me [Mr. Porter] the same [bloody] clothes to burn after the murder." *See id, pg. 354, lines 20-21;* Appellant additionally stated he [Appellant] "stabbed Linda multiple times," and thought she was going to "leave him all

7

alone" and "was going to tell." *See id, pg. 363, lines 10-18.* Mr. Porter drove Appellant home in the silver Cadillac vehicle, where Appellant told Mr. Porter to "keep the car for a while." *See id, pg. 365, lines 3-11.* Mr. Porter noticed specks of blood on the driver's side armrest. *See id, pg. 366, line 20 – pg. 367, line 11.* Thereafter, Mr. Porter called his friend "Puncho" to "help [Mr. Porter] get rid of [Appellant's] clothes." *See id, pg. 369, lines 9-19.* Mr. Porter later drove to "Puncho's" house to use the fire pit, where Mr. Porter burned the clothes. *See id, pg. 370, line 1 – pg. 371, line 9.* Afterwards, Mr. Porter and "Puncho" picked up Appellant in the silver Cadillac vehicle, where Appellant and Mr. Porter had a conversation about the murder, including Appellant's statement "she's not going to send me to jail." *See id, pg. 371, line 14 – pg. 375, line 1.*

Ronald Montanez, a/k/a "Puncho," was also called as a Commonwealth witness. *See id, pg. 423, lines 20-23.* According to Mr. Montanez, Terrance Porter called him around 7:30 a.m., July 22nd, 2016, and asked to use Mr. Montanez' fire pit. *See id, pg. 416, line 24 – pg. 417, line 6.* Mr. Porter later arrived at Mr. Montanez' house in a gray Cadillac vehicle with the clothes, which he threw in Mr. Montanez' fire pit and burned them [the clothes]. *See id, pg. 418, lines 5-17.* Mr. Montanez noticed a pair of white Nike sneakers included with the clothes and the white Nike sneakers had blood on them. *See id, pg. 418, line 23 – pg. 419, lines 11, 15-17.* Thereafter, Mr. Montanez and Mr. Porter "picked up Mr. Porter's uncle," who Mr. Montanez referred to as "Clay" [i.e. Appellant]. in the silver Cadillac vehicle. *See id, pg. 420, line 15 – pg. 422, line 5.* During the ride in the silver Cadillac vehicle, Appellant a/k/a "Clay" was not aware Mr. Montanez was in the backseat and Appellant was having a conversation with Mr. Porter, but Appellant "flipped out" and began asking "why he [Mr. Montanez] in my car," after which Mr. Montanez exited the vehicle. *See id, pg. 422, line 6 – 423, line 4.*

8

On July 29th, 2016, Detective Mark Sennett, City of Erie Police Department, went to Ronald Montanez' residence with Detective-Sergeant Janus and Detective Hertel to assist looking for evidence. *See id, pg. 444, lines 9-23.* Detective Sennett photographed the fire pit and found several items on the bottom of the fire pit, including several rivets, zipper pulls, coins and "tiny teeth like from where the zipper zips together." *See id, pg. 444, line 9 – pg. 445, line 23.*

The Commonwealth also called Lamont Phillips as a witness. At the time of trial, Mr. Phillips is incarcerated in the Erie County Prison on pending robbery charges. *See N.T., Jury Trial, Day 3, pg. 560, lines 2-6.* Mr. Phillips is familiar with Appellant, and has known Appellant for fifteen (15) years as a friend of Mr. Phillips and his family. *See id, pg. 560, lines 7-12.* When Mr. Phillips was incarcerated in the Erie County Prison, F block on January 6th or 9th, 2017, Appellant initiated conversations with Mr. Phillips; specifically, Appellant "came up with a story that [Mr. Phillips] was supposed to tell when [Appellant] had [Mr. Phillips] subpoenaed." *See id, pg. 561, line 5 – pg. 562, line 8.* Essentially, Appellant wanted to "make it look like Terrance Porter killed Linda Gordon." *See id, pg. 562, line 12 – pg. 563, line 4.* Mr. Phillips' explanation of the story Appellant devised is summarized as follows:

On July 22nd, 2016, at 4:30 p.m., Terrance Porter called Lamont Phillips and told Lamont Phillips to bring a tin of cocaine and three (3) rocks of crack outside the residence where Lamont Phillips was staying on West 26th Street. Lamont Phillips noticed "Clay's" silver Cadillac vehicle parked out front. Thereafter, Lamont Phillips jumped in the backseat, and saw a blonde white woman was driving. Terrance Porter was in the passenger seat. Lamont Phillips asked where "Clay" was, and the woman said "at home." Lamont Phillips asked Terrance Porter who the woman was, and Terrance Porter said "Clay's wife." Lamont Phillips felt safe passing the drugs to Terrance Porter.

9

People were saying "Clay's" wife was found dead, and it was not 48 hours from Lamont Phillips' meeting with Terrance Porter and Linda Gordon. Lamont Phillips was in and out of the car in two minutes.

Keisha had Lamont Phillips come to her house to read letter Terrance Porter wrote to her. In the letter, Terrance Porter told Lamont Phillips never to mention he was with Linda Gordon buying cocaine and crack at 4:30 a.m. on July 22nd, 2017. *See id, pg. 568, line 17 – pg. 571, line 12; pg. 576, line 7 – pg. 577, line 23.* Appellant admitted to Lamont Phillips that he went to Terrance Porter's residence, where people saw Appellant changing clothes, and Appellant gave his clothes to Mr. Porter to burn. *See id, pg. 574, line 22 – pg. 575, line 7.* Appellant also admitted to Lamont Phillips that Linda Gordon knew about the bank robberies and Appellant "stabbed her" and "he [Appellant] had to do what he had to do." *See id, pg. 580, lines 5-12.* Appellant offered Lamont Phillips five thousand dollars ($5,000) to ten thousand dollars ($10,000) to give a fabricated story, and Appellant's mother would provide Mr. Phillips wit the money by selling one of her properties. *See id, pg. 583, lines 15-25.* Mr. Phillips expressed concern for Mr. Porter because Appellant told Mr. Phillips "he [Appellant] was going to kill Terrance and his girlfriend." *See id, pg. 584, lines 7-17.*

Finally, according to Detective-Sergeant Janus, several surveillance videos from different locations, including 1916 and 1920 Camphausen Avenue, the Spaeder Company (1800 block of Schaal Avenue) and the Housing Authority of City of Erie (1400 block of East 19th Street), show, at around 6:00 a.m. on July 22nd, 2016, a light-colored Cadillac headed northbound on Camphausen Avenue, then eastbound on East 19th Street and finally westbound on East 19th Street around 6:09 a.m. *See id, pg. 637, line 3 – pg. 652, line 14.* Moreover, several short telephone calls were exchanged between Terrance Porter's cell phone and Appellant's cell phone between 8:00 p.m. on July 21st, 2016 and 9:17 a.m. on July 22nd, 2016. *See id, pg. 656, line 4 – pg. 666, line 25.*

10

Finally, Terrance Porter sent Appellant a text message stating "Scare just called me and said it's mad police over there. What's up? Everything good?", to which Appellant responded "Good." *See id, pg. 667 line 3 – pg. 668, 2.*

## Procedural History

By Order dated August 16th, 2016, Mark T. Del Duca, Esq., was appointed as Appellant's counsel. On October 5th, 2016, a Formal Arraignment was held before this Trial Court. Following the Formal Arraignment, this Trial Court entered an Order on October 6th, 2016, directing discovery be completed by October 19th, 2016, pre-trial Motions be filed by November 7th, 2016 and scheduling the Criminal Jury Trial to begin with *voir dire* and jury selection on March 27th, 2017.

On October 4th, 2016, the District Attorney's Office filed a Criminal Information, charging Appellant with Criminal Homicide-Murder, in violation of 18 Pa. C. S. §2501(a); Aggravated Assault-Attempts to Cause Serious Bodily Injury or Intentionally, Knowingly or Recklessly Causing Serious Bodily Injury, in violation of 18 Pa. C. S. §2702(a)(1); Recklessly Endangering Another Person, in violation of 18 Pa. C. S. §2705; Possessing Instruments of Crime, in violation of 18 Pa. C. S. §907(a); Abuse of Corpse, in violation of 18 Pa. C. S. §5510; and Tampering with or Fabricating Physical Evidence, in violation of 18 Pa. C. S. §4910(1).

A Joint Motion for Extension was filed on November 1st, 2016, which was granted by this Trial Court on November 2nd, 2016 (directing discovery materials to be provided to defense counsel on or before November 29th, 2016 and directing pre-trial Motions be filed by December 16th, 2016).

A Pre-trial Status Conference was scheduled for March 17th, 2017 before this Trial Court. The Commonwealth filed a Motion to Introduce Evidence of Other Crimes, Wrongs or Bad Acts

11

Pursuant to Pennsylvania Rule of Evidence 404(b) on March 20th, 2017. Following a hearing on March 22nd, 2017, this Trial Court granted Commonwealth's Motion.

Following a Criminal Jury Trial beginning on March 27th, 2017 through March 30th, 2017, the jury found Appellant guilty of Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person, Possessing Instruments of Crime, Abuse of a Corpse and Tampering with or Fabricating Physical Evidence. Following a Sentencing Hearing on May 25th, 2017, this Trial Court sentenced Defendant as follows:

- Count One (Murder of the First Degree): life imprisonment without the possibility of parole, with two hundred ninety-six (296) days of credit for time served;
- Count Two (Aggravated Assault): merged with Count One;
- Count Three (Recklessly Endangering Another Person): merged with Count One;
- Count Four (Possessing Instruments of Crime): one (1) year to four (4) years of state incarceration, consecutive to Count One;
- Count Five (Abuse of a Corpse): one (1) year to two (2) years of state incarceration, consecutive to Count Four; and
- Count Six (Tampering with or Fabricating Physical Evidence): six (6) months to two (2) years of state incarceration, consecutive to Count Five.

Appellant, by and through Attorney Del Duca, filed a Notice of Appeal to the Pennsylvania Superior Court on June 12th, 2017. This Trial Court filed its 1925(b) Order on June 13th, 2017. Appellant, by and through Attorney Del Duca, filed a Concise Statement of Matters Complained of on Appeal on July 7th, 2017.

Attorney Del Duca filed an Application to Withdraw as Counsel with the Pennsylvania Superior Court on June 27th, 2017, which the Pennsylvania Superior Court denied on June 30th, 2017 in order to permit Attorney Del Duca to seek relief in the Erie County Court of Common

12

Pleas. Following a hearing before this Trial Court on July 10th, 2017, this Trial Court granted Attorney Del Duca's Petition for Leave to Withdraw as Counsel, and a member of the Erie County Public Defender's Office would represent Appellant for the instant appeal to the Pennsylvania Superior Court. On July 12th, 2017, Attorney Del Duca re-filed his Application to Withdraw as Counsel with the Pennsylvania Superior Court. On July 13th, 2017, Emily M. Merski, Esq., entered an appearance on behalf of Appellant in the Pennsylvania Superior Court. On July 21st, 2017, the Pennsylvania Superior Court granted Attorney Del Duca's Application to Withdraw as Counsel.

## Rationale and Conclusions

**1) The Commonwealth presented sufficient evidence to support the jury's decisions in that Appellant is guilty of Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person, Possessing Instruments of Crime, Abuse of a Corpse and Tampering with or Fabricating Physical Evidence.**

Whether sufficient evidence exists to support the verdict is a question of law; the Pennsylvania Superior Court's standard of review is *de novo* and the scope of review is plenary. *Commonwealth v. Walls*, 144 A.3d 926, 931 (Pa. Super. 2016). In assessing Appellant's sufficiency challenge, the Pennsylvania Superior Court must determine whether, viewing the evidence in a light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that the Commonwealth proved each element of the crime beyond a reasonable doubt. *Commonwealth v. Ansell*, 143 A.3d 944, 949 (Pa. Super. 2016).

In addition, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. *Commonwealth v. Hutchinson*, 947 A.2d 800, 805-806 (Pa. Super. 2008). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Id.* The Commonwealth may sustain its burden of

13

proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Id.* Moreover, the entire record must be evaluated and all evidence actually received must be considered. *Id.* Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Id.*

### a) Murder of the First Degree

Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that the defendant unlawfully killed another human being, that the defendant acted with a specific intent to kill, and that the killing was willful, deliberate, and premeditated. *Commonwealth v. Hanible,* 836 A.2d 36, 38 (Pa. 2003). A specific intent to kill may be proven wholly by circumstantial evidence, and, therefore, may be inferred from the defendant's use of a weapon on a vital part of the victim's body. *Id.* The period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. *Commonwealth v. Rivera,* 983 A.2d 1211, 1220 (Pa. 2009). Indeed, the deliberation and premeditation needed to establish intent exist whenever the assailant possesses the conscious purpose to bring about death. *Id.* The Commonwealth may use circumstantial evidence to establish the elements of first-degree murder, including the element of intent. *Id.*

After a thorough review of the evidence, this Trial Court finds and concludes this evidence, viewed in a light most favorable to the Commonwealth, is sufficient to support Appellant's conviction for Murder of the First Degree. First, several witnesses observed Appellant and Linda Gordon at the Plymouth Tavern on the evening of July 21st, 2016, and Appellant was seen wearing a white t-shirt with block lettering, white pants and black & white colored sneakers. On the morning of July 22nd, 2016, several witnesses observed Appellant arriving at Terrance Porter's residence carrying bloody white clothes. Terrance Porter stated Appellant asked for a change of clothes and gave Mr. Porter the bloody clothes, which Appellant desired Mr. Porter to burn.

14

Terrance Porter called Ronald Montanez, a/k/a "Puncho," to use Mr. Montanez' fire pit and did eventually burn Appellant's bloody clothes in Mr. Montanez' fire pit. Detective Sennett, during a search of the fire pit, found several rivets, zipper pulls, coins and "tiny teeth like from where the zipper zips together," indicating clothes had indeed been burned in Mr. Montanez' fire pit, consistent with the testimony of Mr. Porter and Mr. Montanez.

Second, Appellant stated repeatedly to Mr. Porter that he [Appellant] killed Linda Gordon. Appellant stated to Mr. Porter "I killed Linda," "fuck the bitch, fuck her," "I know the bitch is dead," and other similar statements. According to Mr. Porter, Appellant stated his reason for killing Linda Gordon was that Linda Gordon was "going to leave him alone" and "she was going to tell," referring to alleged bank robberies. While being given a ride home from Mr. Porter, both Mr. Porter and Mr. Montanez overheard Appellant say "she's not going to send me to jail." In addition, Appellant, while incarcerated for these crimes, attempted to fabricate a story with Lamont Phillips, in order to blame the murder of Linda Gordon on Terrance Porter.

Third, physical evidence found at the crime scene, inside of Appellant's vehicle and on Appellant's ring connects Appellant to the murder of Linda Gordon. A knife was found by Detective-Sergeant Janus and Detective Hertel twenty feet (20') from the crime scene on the north side of East 19th Street in a densely-wooded area. Detective Kensill, who collected the knife from the crime scene, observed a red substance on the knife, which showed presumptively for blood. DNA testing of the blood on the knife handle and blade, conducted by Jillian Crouch, forensic DNA scientist with the Pennsylvania State Police, indicated positively for the presence of Linda Gordon's DNA. Also, Detective Rager observed blood transfer on the driver's side of Appellant silver Cadillac vehicle. DNA testing of two (2) swabs from Appellant's silver Cadillac vehicle, conducted by Jillian Crouch, forensic DNA scientist with the Pennsylvania State Police, indicated a mix of two (2) individuals, and Appellant and Linda Gordon cannot be excluded as potential

15

contributors of the mixture, based upon a comparison of the known references of Appellant's and Linda Gordon's blood. Moreover, Detective Rager observed a red substance on Appellant's gold ring, which was seized from Appellant during booking. DNA testing on Appellant's ring, conducted by Jillian Crouch, forensic DNA scientist with the Pennsylvania State Police, indicated a mix of two (2) individuals, and Appellant and Linda Gordon cannot be excluded as potential contributors of the mixture, based upon a comparison of the known references of Appellant's and Linda Gordon's blood. Finally, Y-specific DNA testing of the reddish-brown substance found on Linda Gordon's fingernail clippings, conducted by Jillian Crouch, forensic DNA scientist with the Pennsylvania State Police, indicated a partial Y chromosome (10 of 16 areas present), which matched the known reference for Appellant, meaning neither Appellant nor Appellant's paternally-related male relatives can be excluded as a contributor of this substance.

Fourth, Dr. Vey, following his completion of a full autopsy of Linda Gordon, concluded Linda Gordon died as a result of several sharp force injury wounds, i.e. knife wounds, in to her torso, and the sharp force injury wounds could have been caused by the knife recovered by Detective Kensill from the crime scene.

Finally, several surveillance videos show a light-colored Cadillac, matching the description of Appellant's silver Cadillac vehicle, was seen in the area of East 19th Street at 6:00 a.m. on July 22nd, 2016, where and when the murder occurred. This vehicle is seen leaving East 19th Street ten (10) minutes later.

Based upon the evidence presented, the Commonwealth demonstrated Appellant killed Linda Gordon by stabbing Linda Gordon twenty (20) times in the front and back of Linda Gordon's torso and upper left extremities. Moreover, based upon sufficient evidence of Appellant's stabbing of Linda Gordon, specific intent has been demonstrated by Appellant's use of a deadly weapon. *See Hanible*, 836 A.2d at 38. Finally, Appellant's statements demonstrating

16

he killed Linda Gordon because Ms. Gordon knew of alleged bank robberies and Ms. Gordon was cheating on Appellant demonstrate Appellant acted willfully, deliberately and with premeditation. *See Rivera*, 983 A.2d at 1220. Therefore, the Commonwealth presented sufficient evidence to support the jury's decision in that Appellant is guilty of Murder of the First Degree.

### b) Aggravated Assault

A person is guilty of Aggravated Assault if he... causes serious bodily injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. *See 18 Pa. C. S. §2702(a)(1)*. "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *See 18 Pa. C. S. §2301*.

Based upon the evidence presented above to support the jury's conviction of Appellant for Murder of the First Degree, this Trial Court finds and concludes the evidence, viewed in a light most favorable to the Commonwealth, is sufficient to support the jury's conviction of Appellant for Aggravated Assault. The Commonwealth presented evidence that Appellant stabbed Linda Gordon twenty (20) times, which caused her death, and, based upon Appellant's motive for killing Linda Gordon, i.e. Linda Gordon was cheating on Appellant and also knew of alleged robberies committed by Appellant, Appellant's killing of Linda Gordon manifested extreme indifference to the value of Linda Gordon's life. Therefore, the Commonwealth presented sufficient evidence to support the jury's decision in that Appellant is guilty of Aggravated Assault.

### c) Recklessly Endangering Another Person

A person commits the crime of Recklessly Endangering Another Person if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury. *See 18 Pa. C. S. §2705*.

17

Based upon the evidence presented above to support the jury's conviction of Appellant for Murder of the First Degree, this Trial Court finds and concludes the evidence, viewed in a light most favorable to the Commonwealth, is sufficient to support the jury's finding of Appellant's guilt for Recklessly Endangering Another Person. The Commonwealth presented evidence that Appellant stabbed Linda Gordon twenty (20) times, which caused her death. Appellant's action did more than place Linda Gordon in danger of death or serious bodily injury – said action caused her death. Therefore, the Commonwealth presented sufficient evidence to support the jury's decision in that Appellant is guilty of Recklessly Endangering Another Person.

### d) Possessing Instruments of Crime

Conviction for Possession of Instrument of Crime requires Commonwealth prove a defendant possessed an instrument that is commonly used for criminal purposes, under circumstances not manifestly appropriate for lawful use, with intent to employ it criminally. 18 Pa. C. S. § 907; *see also Commonwealth v. Foster*, 651 A.2d 163, 165 (Pa. Super. 1994).

The evidence presented, viewed in a light most favorable to the Commonwealth, is sufficient to support the jury's conviction of Appellant for Possessing Instruments of Crime. According to Dr. Vey, Linda Gordon's death was the result of sharp force injury wounds, i.e. knife wounds, and a knife was found near the body of Linda Gordon in a densely-wooded area of East 19th Street. At the Criminal Jury Trial, Dr. Vey stated the knife found near Linda Gordon's body could have inflicted the sharp force injury wounds on Linda Gordon. Furthermore, DNA testing of the knife handle and blade indicated conclusively the presence of Linda Gordon's DNA. Finally, Appellant stated to Terrance Porter that he "stabbed Linda." Therefore, there is sufficient circumstantial evidence to demonstrate Appellant possessed the knife found near Linda Gordon's body and employed said knife in a criminal manner, i.e. the murder (via numerous stabbings) of

18

Linda Gordon. Therefore, the Commonwealth presented sufficient evidence to support the jury's decision in that Appellant is guilty of Possessing Instruments of Crime.

### e) Abuse of a Corpse

A person who treats a corpse in a way that he knows would outrage ordinary family sensibilities is guilty of the crime of Abuse of a Corpse. *18 Pa. C. S. §5510.*

The evidence presented, viewed in a light most favorable to the Commonwealth, is sufficient to support Appellant's conviction of Abuse of a Corpse. The evidence demonstrates Appellant stabbed Linda Gordon twenty (20) times. Thereafter, Appellant left Linda Gordon's body on a grassy area on the south side of East 19th Street. Linda Gordon's body was not discovered until after 8:00 a.m. on July 22nd, 2016. Dr. Vey concluded, based upon the onset of rigor mortis and non-fixed livor mortis, Linda Gordon was deceased for less than eighteen (18) hours. Furthermore, several witnesses stated it had been raining heavily around 6:00 a.m. on July 22nd, 2016, meaning Linda Gordon's body was left in the pouring rain for several hours. *See Commonwealth v. Smith*, 567 A.2d 1070, 1073 (Pa. Super. 1989) (concealing a corpse from proper authorities, and failing to make arrangements for burial, sustained conviction of abuse of corpse). Therefore, the Commonwealth presented sufficient evidence to support the jury's decision in that Appellant is guilty of Abuse of a Corpse.

### f) Tampering with or Fabricating Physical Evidence

To establish the offense of tampering with evidence, the Commonwealth must prove three interrelated elements: (1) the defendant knew that an official proceeding or investigation was pending; (2) the defendant altered, destroyed, concealed, or removed an item; and (3) the defendant did so with the intent to impair the verity or availability of the item to the proceeding or investigation. *See 18 Pa. C. S. § 4910(1); see also Commonwealth v. Morales,* 669 A.2d 1003,

19

1005 (Pa. 1996). The Commonwealth is not required to produce the item in question, nor to positively identify it, in order to sustain its burden of proof. *Id.*

The evidence presented, viewed in the light most favorable to the Commonwealth, is sufficient to support Appellant's conviction for Tampering with or Fabricating Physical Evidence. After murdering Linda Gordon, Appellant concealed the knife he used to stab Linda Gordon in a densely-wooded area on the north side of East 19th Street, which was exposed to heavy rain on the morning of July 22nd, 2016. Thereafter, Appellant drove to Terrance Porter's residence with his bloody clothing. Appellant gave those bloody clothes to Mr. Porter and instructed Mr. Porter to burn said clothing, which Mr. Porter did. Based upon this evidence, Appellant, knowing an official investigation into the murder of Linda Gordon was imminent, concealed the knife he used to kill his wife, Linda Gordon, and aided in the destruction of the bloody clothes in order to impair the availability of said evidence; therefore, there is sufficient evidence to support Appellant's conviction of Tampering with or Fabricating Physical Evidence.

**2) Appellant's issue regarding ineffective assistance of counsel is more appropriately raised through a Post-Conviction Relief Act ("PCRA") Petition and should not be reviewed on direct appeal as Appellant's claim is not both meritorious and apparent from the record, nor does Appellant raise "prolix" [i.e. multiple or lengthy] claims of ineffective assistance of counsel.**

The Pennsylvania Supreme Court has held, absent certain specified circumstances, claims of ineffective assistance of counsel should be deferred to Post-Conviction Relief Act ("PCRA") review and, therefore, trial courts should not entertain claims of ineffectiveness upon post-verdict motions and such claims should not be reviewed upon direct appeal. *See Commonwealth v. Holmes,* 79 A.3d 562, 577 (Pa. 2013). Such extraordinary circumstances including where a trial court, in the exercise of its discretion, determines that a claim (or claims) of ineffectiveness is both meritorious and apparent from the record so that immediate consideration and relief is warranted and the administration of criminal justice is better served by allowing trial judges to retain the

20

discretion to consider and vindicate such distinct claims of ineffectiveness. *Id*. Other extraordinary circumstances include cases where "prolix" [i.e. multiple or lengthy] claims of ineffective assistance of counsel are raised. *Id* at 577-578.

After presiding over the entire Criminal Jury Trial and after a thorough review of the entire record for the instant criminal case, including, but not limited to, the direct and cross-examination of witnesses and presentation of evidence during the Criminal Jury Trial beginning on March 27th, 2017 and concluding on March 30th, 2017, this Trial Court, in the exercise of its discretion, does not find Appellant's claim of ineffective assistance of counsel to be meritorious and apparent in order to allow immediate consideration and relief. Moreover, this Trial Court does not find the existence of "prolix" [i.e. multiple or lengthy] claims of ineffective assistance of counsel in this direct appeal to the Pennsylvania Superior Court. Therefore, Appellant's claim regarding ineffective assistance of counsel should not be reviewed on direct appeal; rather, Appellant's claim should be deferred for review under the PCRA, where Appellant would file a PCRA Petition within the appropriate statutory time limits.

For the above reasons, this Trial Court respectfully requests the Pennsylvania Superior Court uphold the jury's findings of Appellant's guilt for Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person, Possession of Instruments of Crime and Tampering with or Fabricating Physical Evidence.

BY THE COURT:

Stephanie Domitrovich, Judge

cc: Erin C. Connelly, Assistant District Attorney
D. Robert Marion, Jr., Assistant District Attorney
Emily M. Merski, Esq. 3820 Liberty Street, Erie, PA 16509
Billy Ray Gordon, #NA4263, SCI Camp Hill, P.O. Box 200, Camp Hill, PA 17001

21